IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Magistrate No.   19-1569 |
| | ) | **[UNDER SEAL]** |
| ABRAHAM MARTINEZ | ) | |
| DONELL HIGGINBOTHAM | ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, John Ypsilantis, being duly sworn, do depose and state the following:

### INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and, acting as such, I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the United States Attorney General to request a search warrant.

2.      I entered on duty at the FBI Academy in Quantico, Virginia on May 14, 2017.  I am currently assigned to the FBI's Pittsburgh Division, Safe Streets Task Force.  I have been assigned to this squad since October 2017.  I was employed as a U.S. Border Patrol Agent with the Department of Homeland Security (DHS) Customs and Border Protection (CBP) from July 23, 2009 to May 13, 2017.  From January 2012 until May 2017 your Affiant was assigned as a Task Force Officer (TFO) to the FBI Cleveland Division Organized Crime Task Force.

3.      During the course of my employment as an FBI Special Agent, FBI TFO, and U.S. Border Patrol Agent, I have participated in numerous complex criminal and national security investigations.  I have also participated in numerous investigations involving the use of federal and state search warrants to collect evidence, including controlled substances, the seizure of narcotics-

1

related records, and other types of evidence that document the activities of criminal organizations in both the manufacturing and distribution of controlled substances. To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including physical and electronic surveillance, various types of infiltration (including undercover agents, informants, and cooperating sources), pen register and trap and trace devices, GPS and telephone tracking devices, trash covers, mail covers, pole cameras, stationary video recordings, and audio and audio/video recording devices.

4.      Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by organized criminal enterprises, drug trafficking organizations, and street gangs to smuggle and safeguard controlled substances and firearms, to distribute, manufacture, and transport controlled substances, and to collect and launder related proceeds. I have personally participated in federal Title III wiretap investigations in the Northern District of Ohio as well as the Western District of Pennsylvania.

5.      As part of your Affiant's duties as a Special Agent, and in the course of my participation in Title III wiretap investigations, I have reviewed thousands of communications between drug traffickers. As a result of my narcotics-related training and experience, I am familiar with the methods and language used to distribute narcotics, to launder proceeds, and to operate drug-trafficking conspiracies.

6.      In addition to the training I received at the FBI Academy and the U.S. Border Patrol Academy, I have received specialized training from the FBI and DHS/CBP focused on topics such as   drug   interdiction,   drug   detection,   money-laundering   techniques   and   schemes,   drug

2

identification, asset identification and removal, and methods utilized by organized criminal enterprises and drug trafficking organizations to carry out the aforementioned criminal conduct.

## PURPOSE AND SCOPE

7.     This Affidavit is submitted in support of a criminal complaint, charging Abraham MARTINEZ and Donell HIGGINBOTHAM with violating Title 21, United States Code, § 846, which prohibits any person from attempting to and/or conspiring to possess with intent to distribute five (5) kilograms or more of a mixture and substance containing cocaine, a Schedule II Controlled Substance, on or about July 16, 2019.

8.     Title 21, United States Code, § 846 makes it a violation of federal law for any person to knowingly and intentionally attempt to and/or conspire to possess with intent to distribute five (5) kilograms or more of a mixture and substance containing cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(ii).

9.     Cocaine is a Schedule II controlled substance, pursuant to 21 U.S.C. § 812, Schedule II (a)(4).

10.     Because this Affidavit is being submitted for the limited purpose of supporting probable cause for a criminal complaint and arrest warrant, I have not included each and every fact known to me concerning this investigation.

## FACTUAL BACKGROUND

11.     In June of 2019, members of the Greater Pittsburgh Safe Streets Task Force, including the Federal Bureau of Investigation (FBI), began receiving information from confidential source(s), regarding the cocaine trafficking activities of MARTINEZ and HIGGINBOTHAM.

12.     Specifically, Confidential Source #1 ("CS1"), who has been cooperating with law enforcement officers for three (3) years or more and is currently motivated by the possibility of receiving consideration for potential state and/or federal criminal charges, informed law enforcement that MARTINEZ contacted him/her to obtain cocaine – specifically, ten (10) kilograms.

13.     CS1 was interviewed, over the telephone, by law enforcement, regarding his/her knowledge of this investigation.  The interviewing agents were fully aware of CS1's identity, and CS1 did not attempt to obscure his/her identity in any manner.

14.     CS1 has prior drug-related criminal convictions; however, CS1's convictions will not be detailed herein as doing so could reveal the identity of CS1, and thereby endanger the safety, of CS1 and law enforcement.

15.     Your Affiant believes that CS1 has provided reliable information for the following reasons:

a.     Information provided by CS1, in other investigations conducted by the Pennsylvania State Police (PSP), has been corroborated in those investigations.  For example, CS1 has successfully conducted several controlled deliveries of currency and drugs in other investigations conducted by PSP.

b.     CS1 has provided detailed information about drug traffickers in past investigations conducted by PSP.  Specifically, he/she has provided significant detailed information about separate drug trafficking investigations, some of which has been corroborated by intensive law enforcement investigations, including physical and electronic surveillance, and seizure of drugs and/or currency.

4

c.      CS1 is a drug trafficker, as confirmed by a past seizure of a large quantity of narcotics from CS1.

d.      CS1 has provided considerable information about drug traffickers and customers/associates.

16.     While your Affiant has not included each and every piece of information CS1 has provided to law enforcement, since doing so could reveal the identity of CS1 and thereby endanger the safety of CS1 and law enforcement, CS1 has provided the following information related to this investigation:

a.      CS1 has firsthand knowledge that MARTINEZ is looking to purchase ten (10) kilograms of cocaine, which MARTINEZ then intends on distributing in the Greater Pittsburgh Region.

b.      CS1 has firsthand knowledge that MARTINEZ utilizes telephone number (646) 620-3887 (the "TELEPHONE").

c.      CS1 has communicated with MARTINEZ via the TELEPHONE, including engaging in communications related to the distribution of narcotics.

17.     As a part of this investigation, MARTINEZ spoke with CS1, who MARTINEZ believed to be a cocaine trafficker from Philadelphia, on at least three (3) occasions, to arrange the drug transaction.  During these conversations:

a.      MARTINEZ arranged to buy ten (10) kilograms of cocaine from CS1.

b.      CS1 offered to bring the cocaine Western Pennsylvania and MARTINEZ agreed.

c.      CS1 and MARTINEZ discuss their drug-trafficking activities and goals.

       d.       MARTINEZ informed CS1 that he can sell at least twenty (20) kilograms of cocaine a month in Pittsburgh.

       e.       MARTINEZ told CS1 that after their first deal he wanted to say less on the phone and meet with CS1, face-to-face, to discuss the business moving forward.

       f.       MARTINEZ indicated that the ten (10) kilograms of cocaine are for another individual; however, MARTINEZ wanted to make some money by charging the intended recipient more than what CS1 was charging MARTINEZ for the ten (10) kilograms.

18.      Law enforcement officers and/or agents recorded and listened to communications between CS1 and MARTINEZ, during which time MARTINEZ was utilizing the TELEPHONE.

19.      Call detail analysis indicates that the TELEPHONE frequently communicates with a telephone number associated with HIGGINBOTHAM. Your Affiant knows, based upon source reporting, that HIGGINBOTHAM is involved in drug-trafficking and is an associate of MARTINEZ.

20.      Toll analysis of the TELEPHONE also revealed that the TELEPHONE frequently communicates with numerous telephone numbers with area codes outside of Pittsburgh.

21.      On Thursday, July 11, 2019, the Honorable Maureen P. Kelly, United States Magistrate Judge for the Western District of Pennsylvania, authorized a search warrant to obtain E-911 Phase II data for telephone number the TELEPHONE. Based upon your Affiant's training and experience, your Affiant knows that cell phone carries will provide E-911 data which provides relatively precise location information about the cellular telephone itself, either via GPS tracking

technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

22.     On July 16, 2019, MARTINEZ and CS1 confirmed that MARTINEZ would meet two (2) of CS1's associates, who were in-fact undercover law enforcement, to conduct a drug transaction for the ten (10) kilograms of cocaine that MARTINEZ was seeking to obtain.

23.     MARTINEZ agreed to pay CS1 $310,000 in exchange for the ten (10) kilograms of cocaine.

24.     On July 16, 2019, law enforcement confirmed that the **TELEPHONE**, used by MARTINEZ, was active and pinging, at approximately 9:00 AM, in close proximity, approximately twenty-five (25) meters, to 1610 Worthington Street, Pittsburgh, PA 15206 (the RESIDENCE).

25.     The RESIDENCE is known by law enforcement as HIGGENBOTHAM's residence. Additionally, a search of law enforcement databases confirm that the RESIDENCE is associated with HIGGENBOTHAM.

26.     At around 10:00 AM, law enforcement conducting surveillance observed MARTINEZ driving a Black Ford Transit (VEHICLE 1) and HIGGENBOTHAM driving a White Ford Econoline 350 (VEHICLE 2).

27.     Law enforcement maintained surveillance on VEHICLE 1 and VEHICLE 2, traveling from the Pittsburgh area to Washington County, where CS1 and MARTINEZ had agreed the drug transaction would occur.

28.     Before arriving at the pre-determined location for the drug transaction, law enforcement observed HIGGENBOTHAM park VEHICLE 2 in a parking lot, exit the vehicle and enter VEHICLE 1, which was occupied by MARTINEZ.

29.     MARTINEZ and HIGGENBOTHAM then traveled, in VEHICLE 1, to the pre-determined location to conduct the drug transaction.

30.     Upon arriving at the pre-determined location, law enforcement observed MARTINEZ exit VEHICLE 1 and meet with CS1's associates.

31.     During this meeting, MARTINEZ inspects one (1) of the kilograms of cocaine, and indicates his approval.

32.     Thereafter, MARTINEZ returned to VEHICLE 1 and MARTINEZ and HIGGENBOTHAM were observed by law enforcement leaving the pre-determined location and returning to the parking lot where VEHICLE 2 was located.

33.     HIGGENBOTHAM is observed exiting VEHICLE 1 and entering VEHICLE 2.

34.     Shortly thereafter, HIGGENBOTHAM is observed exiting VEHICLE 2, carrying a multi-colored back pack, predominately dark blue, a lighter blue, black and lime green, with the price tag still hanging from the front zipper (the BACK PACK).

35.     HIGGENBOTHAM, still carrying the BACK PACK, re-enters VEHICLE 1.

36.     HIGGENBOTHAM and MARTINEZ return to the same location where CS1's associates were waiting.

37.     CS1's associates walk over to VEHICLE 1 where MARTINEZ shows CS1's associates the contents of the BACK PACK, which was U.S. currency.

38.     MARTINEZ is then observed entering the vehicle operated by CS1's associates.

8

39.     The vehicle is observed leaving the premises and driving to a nearby hotel.

40.     Shortly thereafter, HIGGENBOTHAM arrives at the hotel parking lot and drives VEHICLE 1 up to the vehicle operated by CS1's associates.

41.     Upon arriving at the hotel, MARTINEZ is observed exiting the vehicle, walking over to VEHICLE 1 and opening the side door.

42.     Thereafter, MARTINEZ leaves VEHICLE 1, carrying the BACK PACK, and enters the hotel with CS1's associates.

43.     HIGGENBOTHAM remains in the driver's seat of VEHICLE 1.

44.     MARTINEZ enters the hotel room, with CS1's associates to conduct the drug transaction, and placed the BACK PACK down in the room.

45.     At that time, law enforcement observed, via surveillance, CS1's associates – the undercover agents – begin to set up the money counter to count the money for the drug transaction.

46.     Shortly thereafter, but before MARTINEZ took possession of the cocaine, law enforcement converged on the location and arrested MARTINEZ.

47.     At or around the same time, law enforcement converged on VEHICLE 1 and arrested HIGGENBOTHAM.

48.     Law enforcement seized the BACK PACK – that HIGGENBOTHAM had obtained from VEHICLE 2 and MARTINEZ had carried into the hotel room to consummate the drug transaction – and located $310,000, in U.S. Currency in the BACK PACK, which is the price agreed upon by MARTINEZ CS1 for ten (10) kilograms of cocaine.

49.     Law enforcement obtained a federal search warrant for HIGGENBOTHAM's residence, and located, in part, the following items: multiple cell phones, drug-packaging

9

materials, food saver bags, rubber bands, a money counter, a GPS tracker, two (2) RF detectors,

which your Affiant knows to be used by individuals to block cell phone signals, a .380 Llama

handgun, six (6) rounds of .380 ammunition, forty-six (46) rounds of .22 caliber ammunition, and

one (1) round of .40 caliber ammunition.

## CONCLUSION

50.     Your Affiant submits that, based upon the above-described facts, there is probable

cause to believe that Abraham MARTINEZ and Donell HIGGINBOTHAM committed the crime

of attempting to and conspiring to possess with intent to distribute five (5) kilograms or more of a

mixture and substance containing cocaine, a Schedule II Controlled Substance, in violation of Title

21, United States Code, § 846, on or about July 16, 2019.

The foregoing is true and correct to the best of my knowledge, information, and belief.

John M. Ypsilantis
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me
this 17th day of July, 2019.

HONORABLE CYNTHIA REED EDDY
Chief United States Magistrate Judge
Western District of Pennsylvania

10